UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                        )
          Plaintiff,          )
                                        )
      vs.                    )
                                        )    Case No. 4:06CR00205 DJS (AGF)
MARK DARRYL HALL,        )
                                        )
          Defendant.       )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

       This matter is before the Court on the pretrial motion filed by Defendant, Mark

Darryl Hall. Pretrial matters were referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence,

statements, and identification testimony. (Doc. No. 13). An evidentiary hearing was held

on May 12, 2006 and completed on May 16, 2006. The government was represented by

Assistant United States Attorney Roger A. Keller, Jr. Defendant was present and

represented by his attorney, Assistant Federal Public Defender Janis C. Good. At the

hearing, the government presented the testimony of Detective Mark Chambers, who has

been employed with the St. Louis Metropolitan Police Department (SLMPD) for

approximately 33 years and assigned to the sex crimes unit for 15 years; Detective

Michael McQuillen, who has been employed with SLMPD since 1982 and assigned to the

sex crimes unit since 1996; and Officer Sean Mallon, who has been a patrol officer for

four years. The witnesses were cross-examined extensively by defense counsel.

At the hearing, Defendant clarified through counsel that he seeks to suppress the statements made by Defendant, on the ground that they were not voluntary; the photo identification made by Ms. Davey, and any in-court identification she might hereafter make, on the ground that the photo identification was unduly suggestive; and the firearms and other items seized from Defendant's residence, on the ground that the search warrant affidavit contained misstatements and omissions in violation of <u>Franks v. Delaware</u>. Defendant is not challenging the basis for Defendant's arrest on December 20, 2005, which preceded the statements made by him. The parties were given leave to file post-hearing memoranda, after which the matter was taken under submission. Trial is scheduled for July 5, 2006.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Defendant's arrest arose out of two separate reports of sexual assault by two different women during the space of three days. On December 16, 2005, Sergeant Amy Fiala and Officer Sean Wade responded regarding the report of an alleged sexual assault involving a victim named Ms. Giden. The officers interviewed her in her home, and she said that on December 15 she had been forced to engage in sex acts inside a home at 5448 Gilmore by a suspect who was armed with a handgun. She said the person who assaulted her was an acquaintance she knew only as Demarko. At the time, the officers could not

further identify the suspect. The officers reported the matter to Det. McQuillen, of the Sex Crimes Unit, who was unable at that time to investigate the matter himself. The reporting officers went to the hospital with Ms. Giden, where they discussed the matter with her further.

The police report states Ms. Giden initially reported a rape, by vaginal sex, by a black male, 5'5" tall, and dirty, who was driving a four-door Tempest or Taurus. At the hospital, Ms. Giden reported being forced to have anal and oral sex. The report further states that Ms. Giden was intoxicated at the time and changed her story several times, and that when the officers attempted to get further information, she thereafter became belligerent and refused to cooperate further with the police or the hospital personnel. Govt. Ex. 10, pp. 3-4.

The second incident occurred on Friday, December 17, 2005. While on duty that day, Det. Chambers received a request at approximately 10:00 p.m. to meet other officers at the Forest Park Hospital regarding the victim of an alleged rape, named Ms. Davey. Det. Chambers met with Ms. Davey, who stated that she had been walking toward her mother's house in the Walnut Park neighborhood at approximately 5:00 p.m., when a black male drove by in an older model purple or maroon Ford Taurus. The driver rolled his window down and said, "Hey, baby girl." She walked up to see if she knew the driver. Ms. Davey reported that she thought she recognized the man, and that she had perhaps met him some years before at her aunt's house. She continued walking, but the man pulled over to the curb, got out of the car, and approached her. He then pulled out a

gun and forced her to accompany him to a nearby yard and vacant lot where he forced her to perform oral sodomy.

Ms. Davey described the car as an older model 1986-88 Taurus, with a license plate that began with the numbers 616, followed by a series of other numbers. Det. Chambers knew that Missouri license plates were composed of both letters and numbers, while Illinois plates were totally numeric. She provided a full description of the suspect as a black male, age 35-40, 6' to 6' 2" in height, approximately 180-190 pounds, dark-complected, with a scraggy beard. She also stated that the man had bumps all over his face and head. He was wearing a black jacket, yellow shirt, blue jeans, yellow and grey tennis shoes, and a scull cap. He was very loud and appeared nervous, and had an unkempt appearance.

Det. Chambers prepared a police report of the incident, and the following Monday he arranged for an interdepartmental e-mail to be sent describing the incident and detailing the description he had received of both the suspect and the vehicle. The e-mail directed any officer with knowledge of the suspect to contact the Sex Crime Section or Det. Chambers. Govt. Ex. 1. The e-mail was dispatched on Tuesday, December 20, 2006, at 12:20 a.m.

On December 20, 2005, Officer Sean Mallon was on patrol. He was aware of the e-mail sent by Det. Chambers and had also received information at roll call about the alleged sexual assault that took place on the 15th at 5448 Gilmore. At around noon, he saw a maroon Taurus that matched the description in Det. Chambers' e-mail being driven

by a black male who also appeared to match the description in the e-mail, and he decided to conduct an investigatory stop. The vehicle, which was being driven by Defendant Hall, pulled into the Family Dollar lot, and Officer Mallon pulled in behind the Taurus and activated his lights. He obtained Defendant's pedigree information and learned that he resided at 5448 Gilmore, which he recognized as the address of the alleged sexual assault of Ms. Giden, and also saw that Defendant matched the description provided in the e-mail regarding the incident involving Ms. Davey. He ran Defendant through the computer and learned that there was an active warrant for his arrest.

Based on this information and in light of the warrant, Officer Mallon decided to transport Defendant to the Sex Crimes Unit at police headquarters. He also notified Det. Chambers, who happened to be at police headquarters at the time. Det. Chambers was advised by Officer Mallon that he had stopped a suspect matching the description on Lillian and Claxton, also in the Walnut Park neighborhood, relatively close to the area where the incident involving Ms. Davey was alleged to have occurred. He reported that Defendant was driving a maroon, 1986 Ford Taurus that had Illinois plates that began with the numbers 616. Defendant also matched the description provided by Ms. Davey, including the bumps on his head. Det. Chambers learned that Officer Mallon was aware of another similar incident that had occurred on December 15, 2006, involving a suspect with a similar description, in which a victim named Giden reported being forced to perform oral sodomy on Defendant inside his home on Gilmore.

Officer Mallon brought Defendant Hall to Det. McQuillen, who was the person on duty in the Sex Crimes Unit at the time, and advised him of his stop of Defendant and that Defendant lived at 5448 Gilmore. He also related that he knew of a second incident involving a person with a 616 license plate, also involving a sexual assault, and stated that he believed that follow-up was necessary.

Det. McQuillen took Defendant to an interview room on the fourth floor at approximately 1:35 or 1:45 that afternoon, to interview Defendant regarding the Giden incident. At some point prior to the interview, he had retrieved and reviewed the police report regarding the incident related to Ms. Giden. Det. McQuillen could not recall whether Defendant was in handcuffs, but said it was their normal practice to handcuff a suspect to the table. No one else was present during the interview. Det. McQuillen identified himself, and he detailed the allegations made by Ms. Giden from the police report. He thereafter read Defendant his rights under <u>Miranda</u> from a department-issued card that he keeps with him. Det. McQuillen read the rights into the record as he had read them to Defendant on that day. At the time, Defendant did not appear to be under the influence of drugs or alcohol and appeared to understand what was being said. No promises or threats were made to induce Defendant to waive his rights.

Defendant said he understood his rights and agreed to make a statement. Initially, Defendant said he did not know anything about the incident. Det. McQuillen then pulled up a picture of Ms. Giden from the Department of Revenue computer records, which he printed and showed to Defendant. Gov't. Ex. 7. After viewing the picture, Defendant said

that he recognized the woman, and that he remembered picking her up and partying with her at his house. He placed his initials and the date on the photograph of Ms. Giden. Defendant said he had picked her up a few days earlier on Davison and Beacon or Davison and another cross-street,[1] as it was getting dark. They had purchased cocaine, marijuana, and liquor, and they had then gone back to his home at 5448 Gilmore and partied together. During the course of the interview, Defendant identified himself as Damarko, and Det. McQuillen knew that Giden also knew the assailant as Damarko. Defendant denied sexually assaulting Ms. Giden, but did not deny having sex. He said he was foggy regarding any specific sex acts and thought he was too drunk for sex.

Det. McQuillen presented a written consent form for a buccal sample. Govt. Ex. 8. The form signed by him referenced the December 16, 2005, forcible sodomy investigation regarding Ms. Giden. The written form states that Defendant willingly consented to a sample of blood and/or buccal sample, and further states, "No threats or promises have been made, and I have been told that the results of these tests may be presented as evidence in a court of law." Defendant signed the consent form.

Defendant thereafter agreed to make a tape-recorded statement, which began at 2:11 p.m. and ended at 2:24 p.m. Govt. Ex. 9. At the beginning of the statement, Defendant acknowledged that he had made an earlier statement, and that he had been advised of his rights prior to that statement. Det. McQuillen again advised Defendant of

---

[1] The Court was unable to determine the name of the other street identified. The Court notes that Beacon and Davison are located in the Walnut Park neighborhood.

his rights under <u>Miranda</u>, and also advised Defendant that if he decided to answer questions, he could stop and request an attorney at any time. Defendant said he understood. Det. McQuillen advised Defendant that Ms. Giden was accusing him of having forced her to perform oral sex on him and also to have had anal sex.

Defendant's taped statement was similar to his prior oral statement, but in his tape-recorded statement Defendant stated that was "not quite sure" if he and Ms. Giden had sex, but doubted it because he was too drunk. He recalled that in the morning he had his clothes on and that Ms. Giden was "buck naked." He was certain that he had not forced her to have sex. Later in the interview he stated that he could not remember having sex with her positively, but could have had sex with her. He said Ms. Giden left early the next morning, at 8:00 or 9:00 a.m., and that prior to leaving she said she wanted money from him. Defendant stated that he refused, stating that he had already spent enough. When asked why he thought she had accused him of forcing her to have sex, Defendant said she was upset because she did not get any money. He denied raping her or forcing her to have sex and denied owning a firearm.

At the end of his tape-recorded statement, Defendant acknowledged that he had not been threatened in any way by the police, and that Det. McQuillen had treated him fairly, stating that he had done his job. Det. McQuillen estimated that the entire interview between himself and Defendant lasted between 20-30 minutes.

Det. McQuillen left the room after his interview, and Det. Chambers entered the interview room and spoke with Defendant. He introduced himself, said he wished to talk

to Defendant about another matter, and advised Defendant of Ms. Davey's allegations. Upon advice of the allegations, and prior to any questions, Defendant stated, "Does every whore in this city report shit like this when they don't get their money?" Det. Chambers thereafter orally advised Defendant of his rights under <u>Miranda</u> from a card that he keeps with him. At the hearing, he read the rights into the record as he had read them to Defendant. Defendant acknowledged that he understood his rights and made an oral statement, asserting that he had had oral sex that day, but the sex had been consensual.

Specifically, Defendant stated that he had been driving northbound on North Broadway toward Riverview at approximately 9:30 a.m., when he saw a black female waving down cars. He described her as a black female with long braids, whose birthday was either the day of the incident or the day after. The description of the woman Defendant provided matched the description of Ms. Davey. Defendant said he assumed she was a prostitute and stopped and asked her what she wanted. She said she wanted to know if he wanted to get some marijuana and get high with her. He said yes, and she got into his car. He said they drove to a place where they purchased some marijuana. They then went to his house at 5448 Gilmore, where they smoked some marijuana and drank some alcohol. Defendant then dropped her off on Broadway and gave her his cell phone number. He stated that they did not have any sex at that time.

Defendant stated that at approximately 1:30 p.m. that same day, she called him and stated that she wanted some more marijuana. He picked her up, and they purchased some more marijuana and returned to his home, where they smoked the marijuana and drank

alcohol. He said she stated that she wanted to purchase a new dress in order to show off for her fiance, but that she did not have the money. He told her that if she gave him oral sex, he would buy her a dress. He then stated that she performed oral sex on him and asked for her money. He responded that the marijuana and alcohol he had purchased had been enough for the oral sex. He said that she did not seem upset by that and did not bring up the money again. He later dropped her off on North Broadway. He denied forcing Ms. Davey to perform oral sex, stating that the oral sex was consensual, and denied that he owned any firearms.

Det. Chambers asked Defendant if he would sign a consent to search form, and he declined. He asked if Defendant would make a written or taped statement, and he also declined. The interview lasted approximately 20 minutes. At the time of the interview, Det. Chambers and Defendant were each seated on opposite sides of the table in the interview room, and Defendant was not in handcuffs. No other officers were present. Defendant did not appear to be under the influence of drugs or alcohol, and no threats were made to induce Defendant to make a statement. Defendant had prior experience with law enforcement, having previously been convicted at least one time.

Detective Chambers spoke to Det. McQuillen and advised him that he wanted to seek a search warrant of Defendant's home for clothing and firearms. Det. McQuillen discussed his interview of Defendant, but did not detail all of the facts of his case. He did not give Det. Chambers a copy of the police report regarding Ms. Giden, but knew that Det. Chambers could access the report himself. He believed he told Det. Chambers that

oral sex or fellatio was involved and did not recall whether he advised him of the differing stories told by Ms. Giden that were referenced in the police report. He did not review Det. Chambers' affidavit in support of the search warrant prior to obtaining the warrant. At the hearing, Det. McQuillen reviewed the search warrant affidavit and testified that he believed the information in the affidavit pertaining to his own investigation regarding Ms. Giden was true as of the date of the affidavit, and that he still considered the information recited therein to be true.

On the evening of Defendant's arrest, Det. Chambers obtained a LIT photograph of Defendant, which was approximately one year old, to show to Ms. Davey. Given Defendant's unique physical features, which included bumps on his face and head, Det. Chambers assumed he would not be able to put together a lineup of individuals with similar features. He did not use the SLMPD computer system which assists in assembling photographic lineups. Because he had some concerns with displaying a single photo to the victim, he first called the Sex Crime Office of the Circuit Attorney. An Assistant Circuit Attorney advised him to go ahead with the identification, stating, "Ugly persons should not commit crimes. The courts will just have to deal with that."

At approximately 9:00 or 9:30 p.m. that day, Det. Chambers took the LIT photo to Ms. Davey's home. He said he had a photograph he wanted her to look at, showed her the LIT photo of Defendant, and asked if she recognized him. He did not suggest to her that this was the person involved or that he believed it was the person involved. Ms. Davey identified the individual in the LIT photo as the person who had forced her to perform

sodomy.

The following day, on December 21, 2006, while Defendant was still in custody, Det. Chambers requested a search warrant of Defendant's home on Gilmore, seeking firearms, ammunition, and clothing worn by suspect Mark Hall. The affidavit, which was attached to the application and made a part thereof, summarized Det. Chamber's interview with Ms. Davey, her description of the suspect, and the first three digits of the license plate. It further summarized Officer Mallon's stop of Defendant and transport to the Sex Crime Office, and Det. McQuillen's interview, stating that Defendant admitted that he had engaged in oral sex with Giden, but said that the sex was consensual. The affidavit also summarized his own interview with Defendant, stating that "[d]uring the course of that interview, Hall admitted engaging in oral sex (fellatio) with the victim Davey, stating the sex act was consensual and not forced." It further recited that Ms. Davey had viewed a photograph of Hall and positively identified him as the individual who kidnapped her and forced her to have oral sodomy at gunpoint. Finally, the affidavit described the residence at 5448 Gilmore, which it elsewhere referenced as Defendant's residence, and stated that the St. Louis Assessor's Office listed the registered owners as Larry and Susie Johnson, who resided at a different address. The affidavit was executed under oath before a Circuit Judge on December 21, 2005, at 12:10 p.m., who issued a search warrant for the 5448 Gilmore address.

On that same day, Det. Chambers, together with other officers and members of Mobile Reserve, went to 5448 Gilmore to execute the warrant. Det. Chambers banged on

the front door and announced, "Police – SearchWarrant."   They waited 10-15 seconds, and when there was no answer, broke the door down.  No one was inside the residence. During the search, the officers located a 12-gauge shotgun; a 9mm semiautomatic pistol; a fully-loaded magazine; a box of 380. caliber bullets; a box of 20-gauge shotgun shells; two 12-gauge shotgun shells; a yellow shirt; grey and yellow shoes; blue jeans that appeared to have a stain on the the front; and a monthly rental agreement with Defendant's name.  See Govt. Ex. 3.  Det. Chambers contacted the evidence technician, who photographed the scene and seized the clothing.

## CONCLUSIONS OF LAW

### A.   Statements Made by Defendant

Following Defendant's arrest on December 20, he made an oral and a tape-recorded statement to Det. McQuillen, and an oral statement to Det. Chambers.  Defendant seeks to suppress these statements on the ground that they were not voluntary.

A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.  Colorado v. Connelly, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception,

13

and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). See Dickerson, 530 U.S. at 444.

Based on the totality of the circumstances, the Court finds that Defendant knowingly and voluntarily waived his rights, and that all three of the oral statements made by him on December 20, 2005, were voluntarily made. Prior to making his statements to Det. McQuillen, Defendant was orally advised of his Miranda rights. Defendant is a 37-year-old adult who has had prior experience with law enforcement. At the time he was advised of his rights, he did not appear to be under the influence of any drugs or alcohol, or impaired in any other manner. The entire interview took between 20-30 minutes. There was only a single officer in the room with Defendant, and no promises or threats were made to induce Defendant's waiver or his oral statements. In the written consent form signed by Defendant immediately following his first oral statement to Det. McQuillen, Defendant acknowledged that no threats or promises had been made to him.

He thereafter agreed to make a tape-recorded statement, at the start of which he acknowledged that he had been advised of his rights prior to his initial interview. He was again advised of his rights under Miranda, and in that statement Defendant again acknowledged that no threats or promises had been made to him, and that he had been treated fairly. From the Court's own review of the tape-recorded statement, Defendant was calm and cooperative. He appeared to understand the questions asked, and his answers were responsive.

The interview by Det. Chambers followed immediately after the interview by McQuillen. Again, only a single officer was in the room with Defendant, and no threats or promises were made. Prior to his interview, Det. Chambers advised Defendant of his Miranda rights for a third time. Again, Defendant acknowledged that he understood his rights and agreed to make a statement. That Defendant's will was not overborne is further confirmed by the fact that he declined to make a tape-recorded statement or to consent to a search of his residence.

In addition, the statement made by Defendant at the very start of his interview with Det. Chambers, questioning whether every whore in the city reported such matters, is also admissible, because it was not made in response to any interrogation but rather was volunteered by Defendant upon being advised of the allegation made. Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

**B. Photo Identification**

Defendant Hall seeks to suppress the out-of-court photo identification of Defendant

made by Ms. Davey, as well as any in-court identification she may hereafter make. A defendant's constitutional right to due process may be violated by pretrial confrontation procedures that are unnecessarily suggestive and conducive to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293, 302 (1967). Because it is the likelihood of misidentification that violates the right to due process, the court's inquiry focuses on the reliability of the identification. Neil v. Biggers, 409 U.S. 188, 198 (1972).

Any analysis of identification testimony involves a two-step approach. First, the court must examine whether the identification procedures used were unduly suggestive. Biggers, 409 U.S. at 198-99; United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003). Second, if the procedures used were unduly suggestive, the court must then look to the totality of the circumstances to determine whether the identification testimony is nevertheless reliable. Manson v. Brathwaite, 432 U.S. 98, 116 (1977). See Williams, 340 F.3d at 567 (court examines "totality of the circumstances to determine whether the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'") (quoting Simmons v. United States, 390 U.S. 377, 384 (1977)). In determining whether the identification is sufficiently reliable, the court may look to such factors as the witness's opportunity to view the defendant, the witness's degree of attention, the accuracy of any prior description given by the witness, the witness's level of certainty in his or her identification, and the length of time between the occurrence described and the confrontation. Manson, 432 U.S. at 115; Williams, 340 F.3d at 567; United States v. Johnson, 56 F.3d 947, 953-4 (8th Cir. 1995). The identification

testimony may be admitted if the reliability of the identification judged by the above factors outweighs the effect of any undue suggestion. Id. Each case must be reviewed on its own facts. See Manson, 432 U.S. at 114. Here, the government essentially concedes that the use of a single photograph with Ms. Davey was unduly suggestive, but asserts the identification is nonetheless sufficiently reliable that it should not be suppressed.

Notwithstanding the suggestive nature of the identification procedure, under the totality of the circumstances, the Court finds that the procedure did not create "a very substantial likelihood of irreparable misidentification." United States v. Murdock, 982 F.2d 293, 297 (8th Cir. 1991). Ms. Davey was with Defendant for a considerable period of time, at very close proximity, and had a substantial opportunity to observe him. Apparently due to a physical condition, Defendant has very distinct facial features, and Ms. Davey also believed she may have met him previously. Ms. Davey provided a description of the suspect to Det. Chambers just hours after the event, which description was quite detailed and matches both Defendant and his vehicle in all respects. The photograph shown to her was immediately after Defendant's arrest, and just three days after the incident. Thus, applying the factors in Manson, the reliability of Ms. Davey's identification outweighs any undue suggestion, and on the record before the Court, her photo identification of Defendant should not be suppressed. See Manson, 432 U.S. at 114-16 (single photo identification by officer admissible where officer had adequate opportunity to view suspect, was a trained observer, gave a detailed and accurate description of the suspect, was certain of the identification, and identified defendant from

a photo only two days after the incident); accord United States v. Johnson, 114 F.3d 435, 442 (4th Cir. 1998). Given that this is the only ground asserted by Defendant for suppression of any in-court identification that may hereafter be made, on this record the Court finds no basis at this time to suppress any future in-court identification.

## C. The Search Warrant

At the hearing, Defendant narrowed the scope of his challenge to the search of his residence. Defendant does not assert that the search warrant, on its face, lacks probable cause or challenge the scope of the warrant or its execution. Rather, Defendant asserts that the affidavit in support of the warrant contains misrepresentations and omissions that require suppression pursuant to Franks v. Delaware, 438 U.S. 154 (1978). While not conceding that Defendant had made the necessary prima facie showing for a Franks hearing, in light of the pertinent testimony already elicited, the government did not object to completing the testimony requested by Defendant in support of his Franks challenge.

Defendant claims that the search warrant affidavit was untrue or misleading in that it: (i) incorrectly stated that Ms. Giden reported being forced to perform oral sex on Hall, when in fact Giden initially alleged she was forced to have vaginal sex and later stated only that she had had oral sex, and did not specifically state that the oral sex was fellatio; (ii) incorrectly stated that Defendant admitted to having oral sex with Giden, when in fact Defendant could not say for sure whether he had sex and could not recall any specific type of sex acts; (iii) failed to disclose that Ms. Giden described the suspect as 5' 5" in height, while Defendant is 6' tall, and failed to disclose that Ms. Giden was intoxicated at the time

and had told several conflicting stories; and (iv) incorrectly stated that Defendant admitted to having oral sex with Ms. Davey, by name, while in fact Defendant had only admitted to having oral sex on that date with a woman whom Det. Chambers believed matched Ms. Davey's description.

In <u>Franks v. Delaware</u>, the Supreme Court first recognized that where a defendant makes a substantial preliminary showing that an affidavit in support of a search warrant (i) contains a false statement that was knowing and intentionally made, or made with reckless disregard for the truth, and (ii) that the false statement is necessary to establish probable cause, the Fourth Amendment requires that a hearing be held on the matter. <u>Id.</u> at 171. If, at the hearing, the defendant establishes by a preponderance of the evidence both the existence of an intentional or reckless false statement, and that with the false statement set aside, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided. <u>Id.</u> at 156.

The Supreme Court, in establishing the rule in <u>Franks</u>, recognized that it was balancing competing interests; important reasons support the "presumption of validity with respect to the affidavit supporting the search warrant." <u>Franks</u>, 438 U.S. at 167, 171. To receive a <u>Franks</u> hearing, the defendant must make a "substantial preliminary showing," by a preponderance of the evidence, and the false statements must involve "deliberate falsehood or . . . reckless disregard for the truth." <u>Id.</u> at 171. <u>See also</u>, <u>United States v. Clapp</u>, 46 F.3d 795, 798 (8th Cir. 1995); <u>United States v. Keeper</u>, 977 F.2d 1238, 1242 (8th Cir. 1992). "Allegations of negligence or innocent mistake are insufficient." <u>Franks</u>,

438 U.S. at 171; accord Clapp, 46 F.3d at 798.  If, after disregarding the false information

or adding the omitted information, the affidavit would support a finding of probable cause,

no hearing is required.  Id.  As such, the courts have recognized that the "'substantial

preliminary showing' requirement needed to obtain a Franks hearing is not lightly met."

United States v. Hiveley, 61 F.3d 1358, 1360 (8th Cir. 1995) (citing United States v.

Wajda, 810 F.2d 754, 759 (8th Cir.), cert. denied, 481 U.S. 1040 (1987)); see also, United

States v. Gabrio, 295 F.3d 880, 883 (8th Cir.), cert. denied, 537 U.S. 962 (2002).

Admittedly, the affidavit in support of the search warrant is far from perfect; it

misstates or overstates the facts in a few places, and fails to state facts in other places that

would have further supported probable cause.[2]  On this record, however, Defendant has

failed to make the necessary showing for suppression under Franks.

In reviewing Defendant's contentions, it is important to note that most of

Defendant's challenges to the search warrant affidavit relate not to Det. Chambers' own

investigation, but rather to the three or four sentences where he summarizes Det.

McQuillin's investigation related to Ms. Giden.  In Franks, the Supreme Court recognized

that the requirement that information contained in an affidavit be "truthful" does not mean

"that every fact recited in the warrant affidavit is necessarily correct," but rather means

"'truthful' in the sense that the information put forth is believed or appropriately accepted

by the affiant as true."  Franks, 438 U.S. at 165.  See United States v. Carpenter, 422 F.3d

---

[2] For example, the affidavit does not expressly state that Defendant's car and license plate matched the description given by Ms. Davey.

738, 745 (8th Cir. 2005) (minor inconsistencies or discrepancies in the search warrant affidavit do not show deliberate or reckless falsehood), cert. denied, 126 S.Ct. 115 (2006); United States v. Coleman, 349 F.3d 1077, 1084 (8th Cir. 2003) (same), cert. denied, 541 U.S. 1080 (2004); see also, United States v. Schmitz, 181 F.3d 981, 986 (8th Cir. 1999).

As described in Schmitz, the Eighth Circuit has set a stringent test for defining recklessness in the context of a Franks hearing, which requires a showing that the affiant must have entertained serious doubts or had obvious reasons to doubt the truth of his statements.

> [I]n the context of a Franks v. Delaware inquiry, we have declined to adopt a definition of "reckless disregard" that incorporates the "subjective" versus "objective" terminology and have instead explained that
>
>> The test for determining whether an affiant's statements were made with reckless disregard for the truth is not simply whether the affiant acknowledged that what he [or she] reported was true, but whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported.
>
> United States v. Clapp, 46 F.3d 795, 801 n.6 (8th Cir. 1995), quoted in United States v. Johnson, 78 F.3d 1258, 1262 (8th Cir. 1996).

Schmitz, 181 F.3d at 986-87 (modifications in original).

The decision in Clapp illustrates the type of evidence required. In Clapp, an agent, Tweedy, stated in his affidavit in support of a search warrant that he had "participated in an interview" of a particular witness, Smith. He further stated that Smith "didn't know where the remaining $329,600.95 went." In truth, Tweedy had not interviewed the

witness, but rather had overheard agent DiPrima's interview of Smith from his desk 15-20 feet away, while he was working on an unrelated matter. The statement about Smith's knowledge regarding the remaining funds was clearly inaccurate, as Smith had in fact advised DiPrima regarding the disposition of the funds. Indeed, DiPrima had included this information in the report of his interview, but that interview report was not reviewed by Tweedy. Clapp, 46 F.3d at 799, 801. The court found this conduct, while negligent, did not rise to the level of recklessness required under Franks.

> Had Tweedy admitted to having read DiPrima's report yet nevertheless included in the affidavit that Smith did not know where the remaining money went, there might well be grounds for concluding that Tweedy acted in reckless disregard for the truth. Tweedy, however, testified only that he thought the statement was made sometime during DiPrima's interview with Smith.

Id. at 801.

With regard to the statements in his affidavit that Giden reported performing oral sex *on Hall*, and that Hall admitted to having oral sex with Giden, there is nothing in this record to suggest that Det. Chambers must have entertained serious doubts about the accuracy of the statements made or obvious reasons to doubt the accuracy of the information stated. To the contrary, the evidence suggests that this is what Det. McQuillen and Officer Mallon advised him. At the hearing, after reviewing the portion of the search warrant affidavit pertaining to Ms. Giden, Det. McQuillen testified that he believed the information recited therein was true at the time he discussed his investigation with Det. Chambers, and that he continued to believe it to be true. It is clear from Det.

McQuillen's testimony and the evidence related to his investigation that Det. McQuillen believed Ms. Giden had alleged Defendant forced her to perform fellatio, or oral sex on him.  The buccal consent form that he presented to Defendant references "oral sodomy," and in his taped interview with Defendant, he states to Defendant that Ms. Giden had accused him of forcing her to perform oral sex on him.  He testified that he would have so informed the affiant, Det. Chambers.

Even if the Court were to disregard the statement in the affidavit that the oral sodomy was "on Hall," and merely stated that Giden reported being forced to have oral sodomy while inside his home at 5448 Gilmore, and omitted that Defendant admitted to having fellatio with Giden, as opposed to sex, the nature of which he could not recall, there is still more than ample probable cause to support the search warrant.

Nor has Defendant made the necessary showing with regard to the omitted information related to Giden's statement.  While the rule under Franks has been expanded to include deliberate omissions, see United States v. Reivich, 793 F.2d 957, 960 (8th Cir. 1986), the courts have recognized that it is improper to equate material falsehoods with the omission of material information, because the government, in a search warrant affidavit, need only supply those facts necessary to establish probable cause.  Ozar, 50 F.3d at 1445. With regard to omissions, the defendant must show (1) that the affiant "omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, . . . and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause."  Reivich, 793 F.2d

at 961.  See United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002); United States v.

Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Lueth, 807 F.2d 719, 726 (8th

Cir. 1986).  While there are instances where recklessness may be inferred from the fact

that information was omitted, that is "only when the material omitted would have been

'clearly critical' to the finding of probable cause."  Ozar, 50 F.3d at 1445 (quoting

Reivich, 793 F.2d at 961).  See also, United States v. Flagg, 919 F.2d 499, 500-01 (8th

Cir. 1990) ("Omissions of fact are not misrepresentations unless they cast doubt on the

existence of probable cause.")

     In this instance, Defendant has not shown that Det. Chambers acted with the

requisite intent with regard to any information from Giden that was omitted.  Indeed, on

this record there is no evidence that Det. Chambers knew that Giden described Defendant

at 5'5" or that she told conflicting stories.  Even if he had reason to know of the

information, the Court cannot find that the omission of such information was done with

the intent to make the affidavit misleading or in reckless disregard of same.  The fact is

that Giden reported being forced to have sex with an individual at his home at 5448

Gilmore.  Defendant thereafter acknowledged that he "partied" with Ms. Giden in his

home that day and may have had sex.  The affidavit recites Defendant's claim that he did

not force Giden to have sex.  There is nothing in this record to suggest that any prior

conflicting statements by Giden were intentionally or recklessly omitted.  In any event,

even if the omitted material were included in the affidavit, there would still be probable

cause to support the search warrant.

Defendant has also failed to make the required showing under <u>Franks</u> with respect to the final statement challenged. The Court agrees with Defendant that the affidavit somewhat overstates the facts to the extent that it states that Defendant admitted to having fellatio with Ms. Davey, when in fact, Defendant never specifically referenced Ms. Davey by name. But after Det. Chambers described the date of the alleged event and the allegation made to Defendant, he admitted to having had oral sex, but claimed it was consensual. He also described the person involved as a black woman, with long braids, whose birthday was that day or the next day, facts which matched Ms. Davey. As such, it was reasonable for Det. Chambers to infer they were talking about the same woman, and the Court cannot find, on this record, that the specific reference to Ms. Davey was knowingly or recklessly made. <u>See</u> <u>Gladney</u>, 48 F.3d at 313 (where affiant's interpretation of notes as "drug notes" was plausible, no error in concluding statement not a deliberate falsehood or reckless misrepresentation under <u>Franks</u>).

Even if the reference to Ms. Davey by name was omitted, and the affidavit recited only that Defendant admitted to engaging in fellatio, but stated the act was consensual, Defendant's <u>Franks</u> challenge would still fail, as there would still be probable cause. The affidavit would still contain Ms. Davey's detailed description of Defendant; that Officer Mallon was privy to that detailed description when he detained Defendant; that another woman, Giden, claimed to have been forced to have sex with an individual at his home at 5448 Gilmore; that Defendant resided at 5448 Gilmore; that Defendant admitted to having oral sex with a woman in his interview with Det. Chambers, but claimed the oral sex was

25

consensual; that Ms. Davey was shown a photograph of Defendant, and positively identified him as the person who had forced her to have oral sex.

As such, the Court concludes that whether examined individually or collectively, there is nothing to suggest that any misstatements or omissions were knowingly or recklessly, as opposed to negligently, made by Det. Chambers. See Carpenter, 422 F.3d at 745 (minor discrepancies regarding information from informant; statement informant had not given false information in the past, when informant had never provided information in the past; and omission of information that fruits of earlier search had been suppressed by state court, not shown to be intentional rather than negligent). In addition, even if the misstated matters were deleted and the omitted information were included, there would still be probable cause to support the warrant based on the information provided regarding Ms. Davey and other information. Id. For this reason as well, Defendant's Franks challenge fails.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements and Identification [Doc. No. 13] be **DENIED**.

The parties are advised that they have eleven (11) days, to and including June 12, 2006, in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure

to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u>

<u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir.1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 31st day of May, 2006.